# State of New York
# Court of Appeals

MEMORANDUM

This memorandum is uncorrected and subject to revision before publication in the New York Reports.

No. 106   SSM 16
In the Matter of Rosa Rizzo,
        Appellant,
     v.
Thomas P. DiNapoli, &c. et al.,
        Respondents.

Submitted by Sean Patrick Riordan, for appellant.
Submitted by Kate H. Nepveu, for respondents.

MEMORANDUM:

On review of submissions pursuant to section 500.11 of the Rules, judgment affirmed, with costs.

An " 'injury which occurs without an unexpected event as the result of activity undertaken in the performance of ordinary employment duties, considered in view of the

- 1 -

particular employment in question, is not an accidental injury' " (*Matter of Kelly v DiNapoli*, 30 NY3d 674, 681 [2018], quoting *Matter of Lichtenstein v Board of Trustees of Police Pension Fund of Police Dept. of City of N.Y., Art. II*, 57 NY2d 1010, 1012 [1982]).  Substantial evidence supports the determination that the precipitating cause of petitioner's injuries was not an accident.

We need not address our dissenting colleague's assertion that the Appellate Division majority applied a legal standard contrary to our precedent when that court "resort[ed] to a 'reasonably anticipated' doctrine" (dissenting op at 10).  Any substantive distinction—if there is one—between the "reasonably anticipated" standard applied below and the standard we applied in *Matter of Kelly* is irrelevant here.  Petitioner conceded that she knew that the heavy metal door slammed automatically and that on the day of the injury her movements were intended to avoid that quick and forceful closure.  While the known condition may be a risk of the work site, it cannot be the cause of an accident compensable under Retirement and Social Security Law § 363.

Our dissenting colleague nevertheless persists in expressing dissatisfaction with the relevant case law (*compare Kelly* 30 NY3d 688-691 [Wilson, J., dissenting] ["[A] slip on a pool of water in the bathroom or on wet pavement is an accident but a supervisor's fall on uneven pavement while searching for a prowler at night is not"] *with* dissenting op at 18 ["Perhaps there is a hidden logic as to why falling is an "accident" only when the hazard is covered by snow and not by shrubbery or darkness"]) and revives his proposal for a two-part test (*compare Kelly*, 30 NY3d at 686-687 [Wilson, J., dissenting] [proposing two-part test for assessing accidental disability] *with* dissenting op at 3 [proposing two-part test for

assessing accidental disability]; *Kelly*, 30 NY3d at 690-691 [Wilson, J., dissenting] [same] *with* dissenting op at 15-16 [same]).  But we must again reject the invitation to rewrite the statute and reiterate that doing so would be "inconsistent with the legislative policy choice to grant more generous disability benefits to police officers or firefighters injured by stepping into a pothole, or slipping on wet pavement or when getting up from a desk chair" (*Kelly*, 30 NY3d at 681 n 1).

WILSON, J. (dissenting):

Rosa Rizzo worked for the Port Authority of New York and New Jersey as a police officer. On a cold February day, she trudged through the sleet and cold winds at the Lincoln Tunnel to tend to an ailing woman, staying with her until an ambulance arrived. Once it arrived, Officer Rizzo gathered the names of the parties and witness testimony and then headed towards the heated MTA booth so she could write her report. She had used the booth before and knew that its door could swing closed, but she had never heard of anyone

being injured by it. As she squeezed into the booth, however, a violent gust of wind blew the 80 to 100 pound door shut, crushing her right index finger and permanently disabling her from returning to her to a full duty position. It is undisputed that Officer Rizzo is permanently disabled as a result of the door crushing her hand. The door lacked a safety mechanism to prevent exactly this kind of hazardous condition. A "commonsense" way of characterizing this event would be to say that Officer Rizzo was permanently disabled in a workplace accident (*Matter of Lichtenstein v Bd. of Trustees of Police Pension Fund of Police Dept. of City of N.Y.*, *Art. II*, 57 NY2d 1010, 1012 [1982]).

The majority disagrees, stating that substantial evidence supports the proposition that the crash of the heavy metal door was not "an accident." Our decisions and those of the lower courts in this area produce erratic and inexplicably inconsistent outcomes (*see Matter of Kelly v DiNapoli*, 30 NY3d 674, 686 [2018], Wilson, J., dissenting in part).

Injured governmental employees and their employers would greatly benefit from a standard that produced clear, intelligible, predictable and fair results. In the wake of the courts' inability to do so, that task falls to the legislature. Our decisional law concerning Retirement and Social Security Law § 363 asks whether an injury was caused by an accident, a word that has been contorted beyond recognition by courts' efforts to apply a "commonsense definition of a 'sudden, fortuitous mischance, unexpected, out of the ordinary,           and           injurious           in           impact'" (*Lichtenstein*, 57 NY2d at 1012). That definition was first penned in 1958. Its invocation of "fortuitous mischance," which phrase served Faulkner well, has floundered as a legal

term of art (*compare Lichtenstein*, 57 NY2d at 1012, quoting *Arthur A. Johnson Corp. v Indemnity Ins. Co. of N. America,* 6 AD2d 97, 100 [1st Dept 1958], *affd* 7 NY2d 222 [1959] *with* William Faulkner, Go Down Moses 287 [1940]). Our subsequent attempts to clarify that abstruse definition have invited greater confusion.

Our precedents have failed to provide guidance allowing for predictability and consistency; by synthesizing them into two discrete questions we can offer better guidance resulting in more consistent results. To more easily traverse our doctrine, courts should engage in two clear, cabined inquiries to ensure that disability awards fit the purposes of the statutory scheme. Courts should ask "(i) whether the nature of the hazard is part of the bargained-for risks of the job and (ii) whether it is truly unexpected and out of the ordinary, or rather is part of the ordinary risks of daily life" (*Kelly*, 30 NY3d at 686, Wilson, J., dissenting in part). Admittedly, no test can create perfectly consistent results given the haphazard application of the existing doctrine and the illogic of the underlying statutory scheme. But a clearer exposition, with attention to the underlying legislative purpose, would help achieve greater consistency and transparency.

The majority rejects my opinion as an "invitation to rewrite the statute" (majority op at 3). I have extended an invitation; the majority just has the wrong guest in mind. I am not inviting our Court to rewrite the statute; we have been unsuccessful in interpreting it (*see infra* at 19). I am again inviting the legislature to do so. As *Kelly* itself states in the footnote that supposedly rejects my suggestion: "For police officers and firefighters, this statutory structure . . . can lead to incongruous results, as the dissent notes. We do not take issue with the dissent's conclusion that the legislature should consider acting to address

such results" (*Kelly*, 30 NY3d at 681 n 1). I make two principal points in this dissent. First, *Kelly* is the law and that the Third Department violated *Kelly* in this case.[1] Second, the doctrine surrounding *Kelly* is confusing and unfair, and that the legislature should fix it.

I.

The text and history of the underlying statutory scheme, along with the traditional gloss we have given to its words, show why Officer Rizzo should have prevailed in this case.

It helps to recall the odd history and structure of the statute, Retirement and Social Security Law § 363. In 1984, the legislature worked a significant change to the RSSL's treatment of disabled police officers and firefighters (L 1984, ch 661, § 1, codified in Retirement and Social Security Law § 363-c). As explained in the sponsor's

---

[1] To the extent that the majority disagrees with my interpretation of the existing doctrine, it has not explained why my understanding is inconsistent with *Kelly*. In *Kelly*, we rejected both plaintiffs' claims on the ground that their injuries resulted from actions encompassed within their ordinary job duties. I agreed as to one (Sica) and disagreed as to the other (Kelly). As to both, *Kelly* held that the hazard was a "risk of the work performed" (*Kelly*, 30 NY3d at 684). That analysis, outlined in *Matter of McCambridge v McGuire* (62 NY2d 563, 568 [1984]), is the first "part" of the "test" I said courts should use, and I disagreed with the majority's application of the test in that case (*id.*, at 691, Wilson, J., dissenting in part).

The "two-part test" (majority op at 2) that *Kelly* supposedly rejected was my attempt to synthesize our existing case law into words providing clearer guidance: each "part" is simply a restatement of the operative law from relevant precedents of this court (*see infra*, at 16-17). The majority claims to have rejected the "two-part test" (which would constitute the majority's abandonment of our prior caselaw), but it has not clarified what about this "test" *Kelly* rejected. *Kelly* expressly accepted the first part of the test, and could not have "rejected" the second part – how to understand what an "accident" means when the injury does not result from a risk of the work performed – because *Kelly* denied both claims on the grounds that the hazards in question were "inherent risk[s] of petitioners' regular duties" (*Kelly*, 30 NY3d at 684).

memorandum for the 1984 legislation amending section 363, before the passage of that legislation, police officers and firefighters who suffered disabilities rendering them unable to perform their duties might be able to receive retirement benefits in one of two ways. So long as they had served for a sufficient number of years, they could retire with "ordinary disability retirement" benefits regardless of the cause of the disability. In the alternative, regardless of how long they had served, they could retire with "accidental disability retirement benefits," but would have to meet a "very stringent condition precedent that the incapacity to perform the duties of the position [was] the natural and proximate result of an accident sustained in such service" (Sponsor's Mem in Support of Legislation, A.B. 11304-A, Bill Jacket, L 1984, ch 661 at 9).

Noting that the "courts have continually ruled that exertional type injuries are not accidental injuries for the purposes of accidental disability benefits," the legislation created a "new disability retirement benefit" in which the "applicant need only establish that the incapacity is the natural and proximate result of a disability sustained in the performance of the duties of the position, [which is] . . . a considerably less [restrictive] criteria for establishing eligibility to a significant benefit" (*id.*). Whereas the accidental disability retirement benefits were set at 75% of the employee's final average salary, the new "performance of duty" disability retirement benefit was set at 50% of the employee's final average salary. However, the accidental disability benefits were reduced by any workers'

compensation benefits received by the employee, whereas the performance of duty benefits were not.[2]

For police officers and firefighters entering the system on or after January 1, 1985, the legislature eliminated accidental disability retirement benefits. Those who had entered the system before that date could choose between accidental retirement benefits or the performance of duty retirement benefits. It is clear from both the text of the legislation and its legislative history that the legislature's intent was to override the courts' stinginess in allowing benefits to officers and firefighters injured in the line of duty by providing disability retirement benefits without regard to whether the disability was caused by an "accident," but to reduce the State's per-person cost of benefits from 75% of salary to 50%. The statute in that form was easily administrable: once the pre-1985 employees aged out of the system, no further consideration of the meaning of "accident" would be required.[3]

The principal problem arose fourteen years later. In 1998, the legislature reenacted accidental disability retirement benefits for police officers and firefighters. The legislative history explains the reasons for the legislature's change of heart. Senator Trunzo, the measure's sponsor, explained that corrections officers and court officers were eligible to

---

[2] The different treatment of workers' compensation benefits makes an apples-to-apples comparison difficult. The Permanent Commission on Public Employee Pension and Retirement Systems objected to the legislation on the ground that 50% of the employee's public salary plus workers' compensation benefits plus social security disability benefits could wind up with the disabled employee receiving more in retirement benefits than the employee was paid for working (Mem from James F. Regan, June 14, 1984, Bill Jacket, L 1984, ch 661 at 27).

[3] In addition to those who aged out, those who left the system for other reasons and those who, though eligible for accidental benefits chose performance of duty benefits, would also reduce the frequency of cases calling for an interpretation of "accident."

receive a 75% accidental retirement benefit, as were all New York City police officers and firefighters, but Tier 2 police officers and firefighters elsewhere in New York could not receive those benefits. In his words, "[t]he legislation would remedy this inequity." (Letter from Sen. Trunzo to James M. McGuire, June 24, 1998, Bill Jacket, L 1998, ch 489 at 3).

The Division of the Budget further illuminated the legislative purpose, noting that in 1996, the legislature had provided 75% accidental disability pay for correctional officers and security hospital treatment assistants because of the risk of "contraction of HIV, tuberculosis or hepatitis" (Division of the Budget, Budget Report on Senate Bill 6975-A, Bill Jacket, L 1998, ch 489 at 4). The Budget Division also noted that the legislature had enacted 75% accidental disability pension benefits to court officers in 1995, and noted that proponents of the pending legislation "would also argue that police officers and firefighters are exposed to greater occupational risks than are uniformed court officers" (*id.*).

The Budget Division recommended that the Governor veto the legislation, noting that "it could be argued that this bill is inconsistent with past pension reforms" and that it "would provide a greater disability benefit to Tier 2 police officers and firefighters than that afforded to most other Tiers 2, 3 and 4 State and local employees" who received either 60% (Tiers 2 and 3) or 33% (Tier 4) of their final average salary (*id.*). The Budget Division estimated that the legislation would increase pension benefit costs by $19 million (*id.*).

That legislative history makes two points clear. The first is obvious: by reestablishing accidental disability pension benefits, the legislature intended to provide greater relief to those injured by workplace accidents than those injured by physical exertion in the performance of duty. Thus, the legislature determined that an officer

disabled by a suspect's bullet or a firefighter suffering disabling burns will receive a lower disability pension benefit than if that person's injury was caused by an "accident"—however that is defined. Second, some of the risks the legislature intended to cover, including exposure to persons who might transmit serious illnesses, helps us think about what "accident" means. As to the first point, it is very difficult to understand why those injured by means of an "accident"—if "accident" includes ones of the sort that occur in everyday life, such as slipping, tripping and falling—should receive greater benefits than officers or firefighters suffering from the on the job "exertion"-related injuries the legislature sought to reach in 1984 (*see* L 1998, ch 489, § 1, codified at Retirement and Social Security Law § 444 [c]). Thus, we are tasked with determining how to interpret the legislative direction that those police officers and firefighters who are disabled by a workplace accident (a description which one court has even applied to so commonplace an occurrence as falling out of a desk chair (*Matter of Crone v DiNapoli*, 201 AD3d 1260, 1262 [3d Dept 2022])) should receive 75% of their salary instead of the 50% they would receive had they been injured exerting themselves at work (*e.g.*, entering a burning home and blocking a falling beam to save the life of another (*Kelly*, 30 NY3d at 679, 686)).

As to the second point, the legislature clearly meant to include, as "accidents," the communication of a serious illness as a consequence of employment. This helps us distinguish between everyday events, such as missing a step and falling (for which the legislature provided performance of duty benefits at a 50% rate), from more unusual events, such as contracting hepatitis by assisting the victim of an automobile accident (for which the legislature provided accidental disability benefits at a 75% rate).

Focusing, then, on the statutory text at issue here, RSSL § 363 (a) (1) provides that a member of the police and firefighters' retirement system may be entitled to an accidental disability retirement allowance if he or she has been "[p]hysically or mentally incapacitated for performance of duty as the natural and proximate result of an accident not caused by his or her own willful negligence." We have defined an "accident" as a "sudden, fortuitous mischance, unexpected, out of the ordinary, and injurious in impact," finding that "an injury which occurs without an unexpected event as the result of activity undertaken in the performance of ordinary employment duties, considered in view of the particular employment in question, is not an accidental injury" (*Matter of Kenny v DiNapoli*, 11 NY3d 873, 874 [2008], quoting *Lichtenstein*, 57 NY2d at 1012; *accord Kelly*, 30 NY3d at 681). To qualify for an accidental disability retirement allowance, a petitioner must show that her injury was caused by "a precipitating accidental event . . . which was not a risk of the work performed" (*Kelly*, 30 NY3d at 682, quoting *Matter of McCambridge v McGuire*, 62 NY2d 563, 568 [1984]). "[C]ommonsense" (*Lichtenstein*, 57 NY2d at 1012) suggests that it was.

Officer Rizzo was permanently disabled when an "unexpected" (*Kelly*, 30 NY3d at 681) gust of wind slammed a heavy, defective door onto her hand. Getting one's hand crushed by a door is an accident in the "commonsense definition" of the term (*Lichtenstein*, 57 NY2d at 1012). In other contexts, courts regularly refer to incidents where individuals have their hands crushed by doors as accidents (*see, e.g.*, *E.W. v City of New York*, 179 AD3d 747, 748 [1st Dept 2020]; *McGarvey v Bank of New York*, 7 AD3d 431, 432 [1st Dept 2004]; *Duck v D'Angelo*, 32 Misc 2d 164, 165 [Sup Ct, Westchester County 1961]).

Even in the context of accident disability retirement benefits, a door-crush injury would be an accident: when a police officer lost the use of her right-index finger after another officer slammed a car door on it, the First Department described the incident as an "accident" and asked only whether the door slam caused the injury (*see Matter of Bon v Safir*, 307 AD2d 885, 887 [1st Dept 2003]). It even opined that "were we hearing this case on appeal after trial, we undoubtedly would find the Board's contrary determination to clearly be against the weight of the evidence" (*id.*).

II.

The Appellate Division rejected Officer Rizzo's claim by resort to a "reasonably anticipated" doctrine. The majority explicitly does not reach this test (majority op at 2), so that issue is left open here (and perhaps in the Third Department as well)[4] for another day. I would not accept it.[5] The "reasonably anticipated" doctrine effectively reenacts the

---

[4] Even though the Attorney General prevailed below, she requested that we afford full briefing and allow oral argument in this case, because "the Third Department has been internally divided over whether a disability-causing incident can constitute an accident when the injured employee could have reasonably anticipated the hazard." We did not do so.

[5] I am unsure what to make of the majority's observation that "[w]hile the known condition may be a risk of the work site, it cannot be the cause of an accident compensable under Retirement and Social Security Law § 363" (majority op at 2). In *McCambridge*, for instance, we held that an officer who slipped on a wet sidewalk suffered an accident and was entitled to accidental disability benefits as a matter of law (62 NY2d at 568). Surely the officer there knew that rainy sidewalks are slippery. In contrast, Officer Rizzo's knowledge was less specific: she knew the day was windy and knew the door was defective but did not know that the two would combine to pose an enhanced hazard. In any event, if the majority's observation is meant to have any legal force, it would be incompatible with *McCambridge.*

decisively rejected "readily observable" test and undermines the purpose of RSSL § 363 [a] [1].

We rejected the "reasonably anticipated" test when we rejected the logic of the "readily observable" test. In *Matter of Kelly v DiNapoli*, we held that the petitioner did not need to show a condition was "not readily observable" to demonstrate that she was injured in an accident (30 NY3d at 685 n 3). Two months later, in *Matter of Stancarone v DiNapoli*, the Third Department resuscitated the "readily observable" test by asking whether the hazard at issue could be "reasonably anticipated" (161 AD3d 144, 147 [3d Dept 2018]). The Third Department drew the language from one of the cases that we had explicitly criticized in *Kelly*, and even acknowledged that "[s]ome of the phrases that have been used [in determining eligibility for an accidental disability retirement allowance] are overlapping or slightly different ways of saying the same thing" (*Stancarone*, 161 AD3d at 147, citing *Manner of Manning v DiNapoli*, 150 AD3d 1382, 1382 [2017]; *see also Kelly*, 30 NY3d at 685 n 3 [identifying the "readily observable" language of *Manning* and other cases as "inconsistent with our prior case law"]). Nevertheless, despite *Kelly's* disapproval, the Third Department rejected Officer Rizzo's claim because she could have "reasonably anticipated that the wind would blow the door closed on her" (201 AD3d 1098, 1100 [3d Dept 2022]).

The *Stancarone* court should have "readily observed" that its test had been permanently deep-sixed by *Kelly*. In *Stancarone*, the court engaged in the "challenging" task of justifying why a hazard's being "reasonably anticipated" barred a claim for an accidental disability retirement allowance (161 AD3d at 148). The court explained that an

incident that "a person in the petitioner's position and location could or should have reasonably anticipated" was not really an accident because it would be expected (*id.* at 149).[6] A "readily observable" hazard is necessarily a hazard that is "reasonably anticipated" (*see, e.g.*, *Matter of Yurko v DiNapoli*, 122 AD3d 1047, 1048 [3d Dept 2014] ["the pothole was a condition that was readily observable and, therefore, could have been reasonably anticipated"]). Indeed, the *Kelly* court understood the logic of the "readily observable" argument to be that the claimant "could []or should have recognized the danger posed in the circumstances presented" due to the readily observable hazard (30 NY3d at 685 n 3, internal quote omitted). In rejecting the "readily observable" test, *Kelly* rejected the logic of the "reasonably anticipated" test as well.

The hearing officer in this very case struggled with the hazy distinction between these two tests. In his 2019 determination, he ruled that the hazard "could have reasonably been anticipated," citing, *inter alia*, *Matter of Yurko* (122 AD3d 1047) for the proposition

---

[6] The *Stancarone* court attempted to justify its reasonably anticipated test by citing two cases which attached importance to the fact that a petitioner had "direct knowledge" of the hazard (*see* 161 AD3d at 148, citing *Matter of Lang v Kelly*, 21 NY3d 972 [2013]; *Matter of Kenny v DiNapoli*, 11 NY3d 873[2008]). The Third Department overread both of these cases.

In *Lang*, the claimant tripped over a wire that had been strung across the floor for several months. We held that tripping over those wires—which were ordinary and well-known— was not "sudden, fortuitous . . . unexpected [or] out of the ordinary" (21 NY3d at 973). *Kenny* involved a petitioner who knew of a wet ramp and slipped on it, a hazard that was similarly well-known and utterly pedestrian (11 NY3d at 875). Officer Rizzo's case would be more like those if she had previously observed the door being slammed shut by the wind – which she had not. Furthermore, if *Kelly*'s rejection of cases relying on a "readily observable" test is inconsistent with prior decisions of our court, that is all the more reason for legislative action.

"no accident when an officer was injured due to a pothole condition that was readily observable." Slightly more than one year before his determination, we decided *Kelly*, which not only rejected the readily observable test, but also explicitly cited *Yurko* as an example of a case that was "inconsistent with our prior case law" (*Kelly*, 30 NY3d at 685 n 3). Errors like this, leading to inconsistent treatment of claimants, will continue to abound until a better governing test is provided.

In addition to being inconsistent with our case law, the "reasonably anticipated" test also renders text in RSSL § 363 (a) (1) superfluous. A core principle of statutory construction is that "effect and meaning must, if possible, be given to the entire statute and every part and word thereof" (*People v Galindo*, 38 NY3d 199, 205 [2022], quoting McKinney's Cons Laws of NY, Book 1, Statutes § 98[a]). Consequently, a "construction that would render a provision superfluous is to be avoided" (*Galindo*, 38 NY3d at 205, quoting *Majewski v Broadalbin–Perth Cent. Sch. Dist.*, 91 N.Y.2d 577, 587 [1998]). Here, RSSL § 363 (a) (1) prevents a member from recovering when the accident was "caused by his or her own willful negligence." Willful negligence is generally thought to entail a "conscious disregard of the consequences of [one's] actions" (*Matter of Robinson v New York State & Local Police & Fire Retirement Sys.*, 192 AD2d 951, 952 [3d Dept 1993]). A doctrinal formulation that excludes all instances in which an injured party might "reasonably anticipate" a hazard would also exclude all cases in which a party willfully disregarded those reasonably anticipated consequences. Under the "reasonably anticipated" test, the term "accident" renders the qualification on accidents "caused by his

or her own willful negligence" redundant. A court should therefore reject a test defining "accident" on the basis of reasonable anticipation.

The "reasonably anticipated" test also fails a core function of a well-designed doctrine: it does not let claimants reasonably anticipate how a court will rule in their case. For instance, the Appellate Division faulted Officer Rizzo for knowing that the steel door in question was defective and using it anyway (*see* 201 AD3d at 1100). Perhaps she would have fared better with different defective equipment. After all, a police officer was eligible for an accidental disability retirement allowance when he fell from his chair, even though he had seen others falling from their chairs, he knew doing so was a hazard associated with his behavior, and he had not even convinced the hearing officer that the defect caused him to fall (*see Crone*, 201 AD3d at 1264-1265, Aarons, J., dissenting).

Officer Rizzo's claim would gain little traction in the jurisprudence of ice. A police officer who slipped on black ice in a poorly illuminated parking lot can recover (*Matter of Castellano v DiNapoli*, 197 AD3d 1478, 1480 [3d Dept 2018]). Not so, however, if "it was cold" and "there was snow on the ground" (*see Matter of Kempkes v DiNapoli*, 81 AD3d 1071, 1073 [3d Dept 2011]; *accord Matter of Ruggiero v DiNapoli*, 85 AD3d 1282, 1283 [3d Dept 2011]). By contrast, a bus attendant *can* recover, even if "it was cold with a few snow flurries and . . . a few old piles of snow . . . ." (*Matter of Larivey v DiNapoli*, 168 AD3d 1178, 1179 [3d Dept 2018]).

More slippery still is the jurisprudence of wet floors. An employee could reasonably anticipate that "on and off rain" would wet the stairs inside an administrative building (*Matter of Lamb v DiNapoli*, 139 AD3d 1312, 1313 [3d Dept 2016]). But if a cleaning crew

mopped the stairs, she could recover accidental disability benefits because no one would reasonably anticipate that recently mopped stairs might be slippery (*Matter of Como v New York State Comptroller*, 202 AD3d 1427, 1428 [3d Dept 2022]). She had better hope, however, that the custodial staff did not also treat the floors with polyurethane, as she could reasonably anticipate that a wood floor was coated with the clear substance—even if she had never been in the building before and never looked at the floor (*see Matter of Greco v DiNapoli*, 123 AD3d 1366, 1367-1368 [3d Dept 2014]). If the court is unable to identify the slippery substance, however, it may conclude that the employee could not reasonably have been expected to anticipate it, and might therefore allow recovery (*see Stancarone*, 161 AD3d at 149-151; *Matter of Sammon v DiNapoli*, 97 AD3d 952, 953 [3d Dept 2012]).

It is perhaps "the most basic principle of jurisprudence that we must act alike in all cases of like nature" (Henry J. Friendly, *Indiscretion About Discretion*, 31 Emory L J 747, 758 [1982], internal quotation omitted; *see also Enright by Enright v Eli Lilly & Co.*, 77 NY2d 377, 388 [1991]; *Martin v Franklin Capital Corp.*, 546 US 132, 139 [2005]; Benjamin N. Cardozo, The Nature of the Judicial Process 33 [1931]). What is plainly observable from the judicial application of RSSL § 363 is that it regularly treats like cases differently (*see Kelly*, 30 NY3d at 686, Wilson, J., dissenting in part).

### III.

Short of a legislative fix, we must traverse existing doctrine to vindicate the goals of the Retirement and Social Security Law. Our existing doctrine identifies two categories of risks that are excluded from a commonsense definition of "accident." The hazard that

wounded Officer Rizzo—an unexpected gust of wind combined with a defective and unsafe door—fell into neither category.

First, we can ask whether the hazard was "part of the bargained-for risks of the job," or "whether persons in the employee's line of work should reasonably expect to face the sort of hazard that injured the petitioner" (*Kelly*, 30 NY3d at 690, Wilson J., dissenting in part). Bargained-for risks of the job are covered by performance of duty benefits. Once we have concluded that the risk is not part of the bargained-for "risk of the work performed" (*Kelly*, 30 NY3d at 682; *McCambridge*, 62 NY2d at 568), we can second ask "whether it is sufficiently out of the ordinary risks of everyday life to constitute an accident" (*Kelly*, 30 NY3d at 690, Wilson J., dissenting in part; *see also Matter of Starnella v Bratton* (92 NY2d 836, 839 [1998]) [asking whether an event is "so out-of-the-ordinary or unexpected as to constitute an accidental injury as a matter of law"]; *Lichtenstein*, 57 NY2d at 1012 [explaining that an "accident" must be "out of the ordinary"]). By requiring that an accident be something beyond the everyday risks we all bear, we ensure that an officer falling from a desk chair or slipping on wet stairs does not receive greater compensation than an officer injured when attempting a rescue or apprehending a suspect. There remains some incongruity that any accident victim should be entitled to greater compensation than an officer or firefighter injured because of the risks involved in an inherently dangerous job, but by adding back the 75% accidental disability pension benefit, the legislature has directed that result.

Officer Rizzo qualifies for an accidental disability retirement allowance under that framework. Officers face different sorts of bargained-for risks depending on their duty

stations. Persons working at toll plazas have occasionally been struck by the barrier arm of automatic toll machines (*Nikolovdakis v TDC Elecs., Inc.*, 220 AD2d 492, 492 [2d Dept 1995]), have been injured by errant motorists (*Ast v State of New York*, 66 NY2d 998 [1985]), and have even slipped and fallen (*Matter of Klett v New York State & Local Empls. Retirement Sys.*, 210 AD2d 723, 723 [3d Dept 1994]). Officers working at toll plazas do not, however, tend to have their hands crushed when a freak gust of wind collides with a defective door. What happened to Officer Rizzo is not something she had ever heard of happening to any of her colleagues in her eight years of service, let alone something she knew she was getting into when she signed up for the job.

Second, Ms. Rizzo's accident was decidedly out of the ordinary. People are not ordinarily slammed by tempest-tossed 80 to 100 pound steel doors that are not fitted with dampers or other safety equipment. When people are injured by defective doors, they tend to sue for negligence (*e.g. Hinz v Wantagh Union Free Sch. Dist.*, 165 AD3d 1074 [2018]; *New v Stachowiak*, 84 AD3d 1326 [2d Dept 2011]; *Raga v S.S. Kresge Co.*, 274 AD 966 [4th Dept 1948]). They do not tell themselves that their injury was not really an accident because they should have reasonably anticipated being maimed by an 80 to 100 pound slab of steel. Using commonsense, or common parlance, it would be hard to describe what happened to Officer Rizzo as anything other than an accident. It is true that, in the abstract, one might imagine that a very heavy door could be blown shut by a powerful gust of wind, just as one might imagine that an officer removing an injured passenger from a vehicle could contract AIDS or hepatitis. But both are quite remote possibilities; they are the sort of risks the legislature meant to include as "accidents," as contrasted to ordinary risks of

everyday life such as slipping on a wet floor, tripping on an extension cord or falling on ice.

IV.

Without a more straightforward statutory scheme or articulation of our caselaw to guide their analysis, courts are left distinguishing cases according to an inconsistently applied standard that imposes an outdated and unfairly punitive doctrine on otherwise deserving claimants like Officer Rizzo.

For many years, New York was governed by a regime of contributory negligence and a harsh version of assumption of risk, both of which completely barred a plaintiff from recovering any damages if she had contributed at all to her misfortune. That system was harsh, irrational, unfair, and coldly formalistic. In 1972, we recognized the meanness of this system and abolished it for joint tortfeasors (*see Dole v Dow Chem. Co.*, 30 NY2d 143, 153 [1972]). In 1975, the state legislature affirmed *Dole* and extended its "more realistic and fairer standard of comparative negligence . . . to the case-in-chief" (Mem of Stanley Fink, Bill Jacket, L 1975, ch 69, at 5). Today, CPLR 1411 prohibits contributory negligence and assumption of risk from "bar[ring] recovery." RSSL § 363 does not create a negligence regime and is not governed by either contributory negligence or CPLR 1411. Nevertheless, many determinations as to whether an incident was an "accident" under that provision harken to that decisively rejected doctrine.

Perhaps there is a hidden logic as to why falling is an "accident" only when the hazard is covered by snow (*Matter of Lewis v New York State Comptroller*, 176 AD3d 1545, 1546-1547 [3d Dept 2019]) and not by shrubbery (*Matter of Grall v DiNapoli*, 196

AD3d 962, 964 [2021]) or darkness (*Matter of Parry v New York State Comptroller*, 187 AD3d 1303, 1305 [3d Dept 2020]). If it is because an officer should have "reasonably anticipated" the hazard in question, or if the hazard was in some way known to the officer, we should ask whether we are improperly imposing the long-abandoned paradigm of contributory negligence. Officer Rizzo is merely one of many disabled employees buffeted by a whirlwind of legal confusion. It is time for the legislature to construct a statutory edifice that can withstand the gale-force vicissitudes of judicial "commonsense."

On review of submissions pursuant to section 500.11 of the Rules, judgment affirmed, with costs, in a memorandum. Acting Chief Judge Cannataro and Judges Rivera, Garcia, Singas and Troutman concur. Judge Wilson dissents in an opinion.

Decided October 27, 2022